*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | | |
|---|---|---|
| *UNITED STATES OF AMERICA* | ) | |
| | ) | |
| *V.* | ) | *Criminal No. 05-65-P-S* |
| | ) | |
| *LENN DIXON,* | ) | |
| | ) | |
| *Defendant* | ) | |

### AMENDED RECOMMENDED DECISION ON MOTION TO SUPPRESS[1]

Lenn Dixon, charged in an indictment with possession with intent to distribute 50 grams or more of a substance containing cocaine base in violation of 21 U.S.C. § 841(a)(1), moves to suppress evidence in the form of "suspected crack cocaine" and "suspected powder cocaine" seized by the government from a vehicle driven by the defendant.  Indictment (Docket No. 13); Defendant's Motion to Suppress Evidence ("Motion") (Docket No. 28) at 1-2.  An evidentiary hearing was held before me on January 10, 2006 at which the defendant appeared with counsel.  The government presented five witnesses and ten exhibits.  The defendant presented two witnesses and four exhibits.  The defendant did not testify.  Counsel argued orally at the end of the hearing.  I recommend that the following findings of fact be adopted and that the motion to suppress be denied.

### I. Proposed Findings of Fact

Sometime before August 12, 2005, Ernest MacVane, a Windham police officer assigned as a task force agent for the Drug Enforcement Administration (DEA), received information about crack cocaine trafficking from a source who had been providing information since May 2005 and who had

---

[1] This recommended decision has been amended by replacing the name "Brosnihan" with the name "Deneault" in the third line on page
(*continued on next page*)

several felony convictions.  The source was not given money for this information although MacVane and the source discussed the possibility of future financial compensation, depending on the amount of drugs seized as a result of the provided information.  The source told MacVane that on August 12, 2005 an individual from Dorchester, Massachusetts (the "target"), would be transporting crack cocaine from Dorchester to the Lakes Region of Maine, passing through the York tolls on the Maine Turnpike at around 7 p.m.  The source said that the target typically packed his drugs in plastic bags with coffee grounds to throw off drug dogs, that the target had been distributing drugs in Maine for approximately one year, that the target got his supply of drugs from a Dorchester-area source whose last name was Dixon and who had been acquitted of a murder charge.

On August 12, 2005 the target was arrested on Interstate 95.  The arresting officers recovered 110 grams of cocaine base and a quantity of cocaine powder which had been packed in plastic bags containing coffee grounds.  The target had been convicted of armed robbery, assault and aggravated rape.  Initially, two vehicles, one driven by the target and a second driven by a female, were suspected of traveling together.  The target initially denied traveling with anyone else, denied knowing the female driver of the second car and denied that he was trafficking in drugs.  When the drugs were found in the second car, the target said that the woman did not know anything about the drugs.  The target eventually recanted and admitted that he owned the recovered drugs.  No promises were made to induce the target's cooperation, although it is likely that he believed his cooperation would be considered in the disposition of the charges against him arising out of this arrest.

The target said that he got the drugs from Lenn Dixon, who put them in the target's girlfriend's car the previous night.  He said that he suspected that Dixon was from the Dorchester area.  He said that he had been distributing drugs in Portland and Lewiston, Maine, for about one year, that Dixon

--------------------------------------------------

6.

was his only source of supply, that he was in debt to Dixon for $8,000, that he had obtained a .45 semiautomatic pistol from a person in Lewiston as payment for an outstanding drug debt, and that the pistol was stored in a room adjacent to his bedroom in Dorchester in a black bag in a closet.  He gave consent to search his residence in Dorchester and gave MacVane the key to that residence, which was owned by his mother and for which he paid rent.  Agents Malcolm Van Alstyne and David Brown of the Bureau of Alcohol, Tobacco and Firearms traveled to Dorchester with the key and found the gun where the target said it would be.

The target said that Dixon had been acquitted of a murder charge.  Another confidential informant told MacVane this as well.  During questioning the target received a call on his cell phone which he did not answer.  He saw the number of the caller and said that Dixon was trying to call him. Later, the target called the same number.  The call was monitored and recorded by MacVane.  The target said that he was speaking with Dixon.  MacVane had not heard the voice identified as Dixon's before.  The target and the person he identified as Dixon spoke about the target's safe arrival in Maine and plans to meet at a later date for a future delivery of cocaine.  Government Exhibit 2 is a tape recording of that conversation.  Government Exhibit 2T is a transcript of that conversation.  When he first heard the conversation, MacVane thought that the target asked Dixon for "something" and he put that term into his complaint affidavit; he later determined that the target had in fact asked for "the same thing."  MacVane interpreted both terms to be requests for cocaine.

MacVane met again with the target on August 14, 2005.  Five monitored calls were placed to Dixon on the target's cell phone that day.  MacVane monitored and recorded the first four.  The final call was monitored and recorded by DEA special agent Katherine Barnard.  The calls were placed to the same number used for the call on August 12.  The first four calls involved discussions of when the target would return home and plans for the delivery of cocaine.  Dixon and the target arranged to meet

at the Subway store in Kittery, Maine at 10 p.m. that night.  There was no explicit reference to drugs in these conversations, but MacVane heard what he understood, based on his training and experience, to be code language referring to cocaine base, such as "want[ing] it wet," which is a slang term for cocaine base deriving from the manufacturing process in which cocaine base typically is initially wet, and "little play toys," which is code for packages of crack cocaine.  The target also told MacVane that they had been talking about cocaine.

Government Exhibit 3 is a recording of the first four August 14, 2004 conversations. Government Exhibit 3T is a transcript of those conversations.  The voice which the target identified on August 12, 2005 as that of Dixon is the same voice involved in conversation with the target on August 14, 2005.  The target described a dark bluish-gray BMW with Massachusetts license plates as Dixon's car.  He said that the BMW had a "hide," a hidden compartment where drugs were kept.  He described Dixon as a heavy-set black male.

MacVane met with agents from the Portland DEA office, the Kittery Police Department and the York Police Department in the Kittery Police Department building on the evening of August 14, 2005, to give them the history of the case and information as it came in, including the description of Dixon's car and his name.  MacVane initially thought Dixon's first name was Lynn; he is not sure when he realized that the first name actually is Lenn.  MacVane told the other officers about the firearm recovered from the target and that Dixon had been acquitted on a murder charge.  Surveillance was set up at the off-ramp from Interstate 95 to Route 1 in Kittery.  The plan was to find the BMW and make a traffic stop.

During the surveillance the target was in a vehicle nearby with Barnard, who monitored and recorded the fifth call that day between the target and Dixon.  The call was placed, at a time between 10:30 and 11:00 p.m., on the target's cell phone to the same number called previously that day and on

4

August 12, 2005.  During that call Dixon said that he was one exit away and would be at the Subway soon.  This information was passed along to the other officers and agents involved in the surveillance.  Government Exhibit 5 is the tape of this conversation; Government Exhibit 5T is the transcript of the conversation on this tape.  The target did not address Dixon by his given name during this or any of the other recorded conversations.  MacVane testified that members of drug trafficking organizations often use nicknames to refer to each other rather than their given names.

Charles Deneault, a sergeant with the Kittery Police Department and a certified radar operator, was called in as a shift supervisor to work on the August 14 surveillance.  He and the two patrol officers of whom he was in charge each took an assigned place along Route 1 in Kittery near the Subway in a marked Kittery police car.  Officers Brosnihan and Shisler were in the other two cars.  Deneault had a Decatur Genesis III radar unit in his car which was working properly when he checked it at the beginning of his shift on August 14 and again immediately after the defendant's BMW was stopped.  The speed limit on that portion of Route 1 is 25 miles per hour; the limit is posted at three locations which were passed by the BMW before it was stopped.[2]  Deneault was informed through a Nextel direct connection that DEA officers had spotted the BMW, at which point he contacted his officers and told them to start moving.  Agent Tully saw the brake lights of the BMW come on briefly as it passed the Subway.  As Deneault moved his car closer to Route 1, he heard that the BMW had kept going past the Subway.[3]  He looked up the road and saw the BMW traveling at a high rate of

---

[2] These signs are located at the points marked 9, 10 and 11 on Government Exhibit 1, an enlarged aerial photograph of the relevant portion of Route 1 in Kittery, Maine.  The other numbers on this exhibit denote the following: 1 is the area where MacVane, Windham police officer and canine handler William Andrew, and Andrew's police dog, Max, were stationed for the surveillance; 2 is the area where the BMW was stopped; 3 and 4 are where MacVane thought the Subway store might be located; 4 is where all other witnesses who were asked said the Subway store was located; 5 is where Barnard and the target were located; 6 is where Deneault was located at the start of the surveillance; 7 is where Brosnihan was located; 8 is where Shisler was located; 12 is the point on Route 1 starting at which vehicles heading north were visible to Deneault before he moved his car closer to Route 1; 13 is where DEA agent Brian Tully was located during the surveillance.

[3] MacVane testified that drug traffickers will often do a "heat run," in which they drive by the location of an agreed meeting without stopping to be sure that it will be safe to stop there.

speed.  He estimated the speed to be 50 miles per hour.[4]  He turned on his radar unit, which registered 48 miles per hour, then 50 and then 54.  Deneault did not write a report about his part in this stop until approximately two months later, at MacVane's request.  On the night of the stop, Deneault believed, based on his conversation with MacVane, that he did not need to write a report.

John Brosnihan, a Kittery patrol officer, had been instructed to pull out and stop the suspect after the BMW turned into the Subway parking lot; if the car did not turn off Route 1 he was instructed to make a "felony-type stop," which involves ordering the driver of the stopped vehicle out at gunpoint.  When Deneault ordered him to pull out onto Route 1, Brosnihan did not see the BMW at first, but he soon saw it and accelerated and caught up to it with his lights flashing.  Deneault, who testified that he believed that Brosnihan's cruiser may have caused the 54 m.p.h. reading on his radar, pulled out onto Route 1 behind Brosnihan after the BMW passed him.  MacVane's vehicle followed behind, as he waited for the Kittery officers to make the stop.

When he reached the stopped BMW, MacVane parked his car behind the last cruiser in line and approached the BMW.  He did not draw his weapon, but the BMW was surrounded by officers with their guns drawn and pointed at the BMW.  Andrew approached the driver's side of the BMW with a semiautomatic rifle pointed at the BMW.  MacVane saw that the gray BMW had a Massachusetts license plate.  He saw that the only occupant of the BMW was a black male who was moving his hands down toward his sides.  MacVane opened the driver's door and pushed the defendant's hands down so that he could not use them.  He then determined that the defendant had been trying to unfasten his seat belt.  He asked the defendant, "Are you Lenn Dixon?" and the defendant said, "Yes."  MacVane moved the defendant from the car to a prone position on the ground, handcuffed him, and placed him in the back seat of Brosnihan's cruiser.

---

[4] Deneault testified that he makes a visual assessment of a vehicle's speed every time he makes a traffic stop, a frequent occurrence in (*continued on next page*)

Tully read the *Miranda*[5] rights to the defendant from a card provided to him by MacVane. A photocopy of the card is Government Exhibit 4. He then asked the defendant if there were any narcotics in the BMW. The defendant said, "No." Tully then asked for permission to search the BMW. The defendant said, "Go ahead, rip it apart," in a very confident manner.

After the defendant was placed in the cruiser, Andrew went back to the vehicle in which he and MacVane had arrived and brought Max, who is trained and certified as a drug-sniffing dog, up to the right front side of the BMW. As they moved along the passenger side of the BMW, Max made a positive indication at the seam between the front and back doors. Andrew then opened the back door and allowed Max to move into the BMW. Max made a positive indication on the dashboard in the area of the passenger air bag. Andrew told MacVane this and put Max back in MacVane's vehicle. Tully and MacVane searched the interior of the BMW but found nothing. Andrew then brought Max back to the BMW, where the dog again alerted to the same area of the dashboard. Tully and MacVane were again unable to find anything in that area of the BMW. Max alerted to the same area of the dashboard a third time, this time with such vigor that he began chewing on it. The officers' search of the area again was not fruitful. One of the officers present ran a check on the license plate number of the BMW and the officers learned that it was registered to the defendant.

Also after the defendant had been placed in the cruiser, Barnard drove by the scene of the stop with the target, who told her that he recognized the BMW as Dixon's car.

After approximately an hour, MacVane suspended the search and arranged for the BMW to be taken to the Kittery Police Department and secured. He did this for safety reasons: to get the BMW off Route 1, where there was little light at 1 a.m., and to avoid deployment of an air bag while that area of the BMW was being dismantled. The next morning, between 8:30 and 9:00 a.m., Tully and Detective

_____

his 21 years in law enforcement.

Hamel resumed the search of the BMW, using tools to dismantle the dashboard after a drug dog again indicated on the same area of the dashboard.  They discovered a wiring system with switches which they followed far behind the dashboard and under the air bag.  Eventually they located a hidden compartment.  They were unable to open the compartment by use of the switches, so they disconnected all the wiring around the air bag.  Hamel then forced open the door of the compartment, inside which they found two bags containing substances which they believed to be crack and powder cocaine and which field tested positive for cocaine.  Each bag weighed in excess of 50 grams.  Government Exhibit 6 is a series of photographs of the bags of cocaine.  Government Exhibit 7 is a series of photographs of the wiring behind the dashboard of the BMW.

Defendant's Exhibits 1-4 are photographs of the BMW taken at night in the Kittery Police Department storage area.

## II.  Discussion

The defendant first contends that the stop of the BMW "violated *Terry v. Ohio* [392 U.S. 1 (1968)] and the Fourth Amendment" because the officers involved did not have a "reasonable articulable suspicion of criminal activity" and were not "able to affirmatively link the individual in the vehicle with the individual who had had the recent conversations with the" target.  Motion at 4.  To the contrary, the officers involved in stopping the BMW on August 14, 2005 clearly had a reasonable articulable suspicion that the driver of the BMW was engaged in bringing drugs into Maine, based on the information gleaned from the informant and the target and on the fact that the BMW appeared where and when it was expected based on the final telephone call between the target and the man he identified as Lenn Dixon.  The individual driving the BMW was "affirmatively link[ed]" with the person who had had the recent conversations with the target by driving that vehicle exactly where and

---

[5] From *Miranda v. Arizona*, 384 U.S. 436, 467 (1966).

when it was expected to appear based on what the individual identified by the target as Lenn Dixon had said in those conversations, as well as the other information provided by the target. *See generally United States v. Chhien*, 266 F.3d 1, 6 (1st Cir. 2001) (defining reasonable suspicion in context of traffic stop). Were any further evidence necessary to demonstrate that the stop was reasonable, Deneault's estimate that the BMW was traveling at a speed of 50 m.p.h in a zone with a 25 m.p.h. limit, as well as his initial radar reading of 48 m.p.h., provide such evidence.[6]

The defendant next argues that probable cause did not exist to justify his arrest. Motion at 6. Citing *Illinois v. Gates*, 462 U.S. 213, 230 (1983), he asserts that the arresting agents "rel[ied] entirely on the information given to them by the" target and made "no independent observation relating to the Defendant that would cause them to suspect that the Defendant was involved in any criminal activity." Motion at 6. He contends that "[e]ven the statements made by the Defendant during the recorded phone conversations . . . do not lead a reasonable prudent individual to suspect any criminal activity on the part of Defendant." *Id*. He concludes that he was therefore arrested without probable cause. *Id*. Counsel for the defendant emphasized this claim in his oral argument at the end of the evidentiary hearing, contending that the target was an unreliable source of information due to his criminal history and the fact that he initially lied to MacVane when he was stopped and arrested; pointing out that MacVane could not verify the name (Lynn or Lenn Dixon) that the target gave him; suggesting that the driver of the BMW "could have been anyone" as far as the officers knew. He also pointed out that the BMW did not stop at the Subway as it was "supposed to" do and that the BMW had not been described as having tinted windows, a feature which it did have. He contended that the evidence that the BMW was speeding should be discounted because, if the defendant had been

---

[6] The defendant also asserts that a custodial arrest occurred when the BMW was stopped and surrounded by officers with drawn weapons, placing the burden on the government "to prove that probable cause existed prior to the arrest." Motion at 5. The government has more than carried any such burden.

speeding, Deneault would have written a report "in the next couple of days," rather than two months later when MacVane asked him to do so.

In *Gates*, the Supreme Court stated that an informant's veracity, reliability and basis of knowledge "are all highly relevant in determining the value of his report," but added that these factors "should be understood simply as closely intertwined issues that may usefully illuminate the commonsense, practical question whether there is 'probable cause' . . . ." 462 U.S. at 230. These factors are part of the "totality-of-the-circumstances analysis" that is to guide determinations of probable cause. *Id* at 233. In turn, the constitutional validity of an arrest

> depends . . . upon whether, at the moment the arrest was made, the officers had probable cause to make it — whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense.

*Beck v. Ohio*, 379 U.S. 89, 91 (1964).

Here, the officers did not rely solely on information provided by the target, although I note that his self-incriminating information with respect to the pistol was independently confirmed by the agents who searched his residence in Massachusetts with his consent, certain other information which he provided about the defendant was corroborated by the information obtained from the first informant and a third individual, and much of what he said was confirmed by his telephone conversations with the defendant that were monitored and taped by the agents. *See United States v. Diallo*, 29 F.3d 23, 26 (1st Cir. 1994) (police need not corroborate every detail of informant's tip; fact that informant correctly reported location of suspects, type of car one would be driving and that the three suspects would be traveling together sufficient to establish probable cause); *see also United States v. Barnard*, 299 F.3d 90, 93-94 (1st Cir. 2002) (information provided for no consideration bears some assurance of reliability; credibility of informant enhanced to extent he has first-hand knowledge). The target's

10

criminal history is not a deciding factor in determining reliability; it is merely one of a number of factors to be included in that analysis. *See, e.g., United States v. 1948 South Martin Luther King Drive*, 270 F.3d 1102, 1112-13 (7th Cir. 2001) (trial court did not err in finding that informants with criminal records were reliable).

In this case, the officers also relied on information provided by two other informants and by the defendant himself during the monitored telephone conversations. They made several independent observations of the defendant, including what he said during the monitored telephone conversations in which coded language was used, as recognized by MacVane; the presence of a BMW fitting the description of the defendant's vehicle where and when it was expected; the fact that the brake lights of the BMW went on as it passed the Kittery Subway store; and the speed of the BMW. The statements made by the defendant during the telephone conversations would, and did, lead a reasonable, prudent officer familiar with the coded language of drug dealers to suspect criminal activity. The mere fact that MacVane could not "verify" the defendant's name before he was arrested does not vitiate the wealth of information that was otherwise available to the officers at the time of the stop and arrest. The driver of the BMW most emphatically could not "have been anyone" by the time the officers saw it on Route 1 in Kittery, given the amount of information they already had about the car and its driver. The fact that the informants did not mention that the BMW had tinted windows is similarly unavailing as a reason to discount all of the other correct information that was provided to the officers. The witnesses credibly explained the facts that the BMW did not stop at the Subway on its first approach to the scene and that Deneault did not immediately write a report. There was sufficient probable cause to arrest the defendant at the time the BMW was stopped.

Finally, the defendant contends, in conclusory fashion, that the BMW "was searched prior to developing probable cause and or prior to obtaining the voluntary consent of Defendant," in violation

11

of the Fourth Amendment.  Motion at 7.  Tully testified that the defendant told him, when asked for permission to search the BMW, "Go ahead; rip it apart," and that he then told MacVane that the defendant had consented to a search of the BMW, all before canine Max began his search inside[7] the BMW.  It is not necessary to determine the timing of these events, however, because the agents clearly had probable cause, based on the target's information and the monitored telephone calls, to believe that the BMW contained contraband.  A warrantless search, with or without consent, accordingly was permissible.  *See generally United States v. Lopez*, 380 F.3d 538, 544-45 (1st Cir. 2004).

### III.  Conclusion

For the foregoing reasons, I recommend that the defendant's motion to suppress be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within ten (10) days after being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 3rd day of February, 2006.

/s/ David M. Cohen
David M. Cohen
United States Magistrate Judge

**Defendant**

**LENN DIXON** (1)                    represented by  **PETER J. CYR**
                                                      LAW OFFICE OF ANTHONY J.
                                                      SINENI
                                                      701 CONGRESS STREET

---

[7] A canine sniff of the outside of a vehicle does not constitute a search within the meaning of the Fourth Amendment. *United States v. Rodriguez-Morales*, 929 F.2d 780, 788 (1st Cir. 1991),

PORTLAND, ME 04102
772-9053
Email: peter@sineni.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**RUDOLPH FINDLEY MILLER**
R.F. MILLER AND ASSOCIATES
ONE MCKINLEY SQUARE
BOSTON, MA 02124
(617) 723-9500
Email: rfmillerlaw@msn.com

**Plaintiff**

USA                          represented by   **MICHAEL J. CONLEY**
OFFICE OF THE U.S.
ATTORNEY
DISTRICT OF MAINE
P.O. BOX 9718
PORTLAND, ME 04104-5018
207/780-3257
Email: michael.conley@usdoj.gov